CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 08 2016

JULIA C. DUDLEY, CLERK
BY: /s/
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| HASSIN HUBBERT,<br>　　Plaintiff, | Civil Action No. 7:14-cv-00530 |
| v. | **MEMORANDUM OPINION** |
| G. K. WASHINGTON, et al.,<br>　　Defendants. | By:　Hon. Michael F. Urbanski<br>　　　United States District Judge |

Hassin Hubbert, a Virginia inmate proceeding pro se, filed a civil rights complaint pursuant to 42 U.S.C. § 1983, naming various current and former staff of the Virginia Department of Corrections ("VDOC") and Red Onion State Prison ("Red Onion") as defendants. Plaintiff complains that his classification and incarceration at Security Level S in Red Onion between August 2013 and October 2014 violated the Eighth and Fourteenth Amendments of the United States Constitution. Defendants filed a motion for summary judgment, and Plaintiff responded, making the matter ripe for disposition. After reviewing the record, the court grants the motion for summary judgment as to the Eighth Amendment claim, denies it as to the Fourteenth Amendment claim, and requires additional briefing.

### I.

On August 14, 2013, Plaintiff was moved into the special housing unit at Keen Mountain Correctional Center ("KMCC") due to an unspecified "pending investigation." It is not clear whether the transfer was related to an institutional investigation commenced at KMCC around the same time to determine whether inmates conspired to murder another inmate and also kidnap, escape, and murder the KMCC Warden. Plaintiff alleges that his move into the special housing unit had nothing to do with that institutional investigation. Although no institutional charges were lodged against Plaintiff, KMCC officials recommended that Plaintiff be temporarily

transferred to Red Onion, which occurred the next day. Plaintiff alleges that he had not received an institutional charge for almost two years before the transfer.

Plaintiff was confined in administrative segregation upon arriving at Red Onion pending an initial classification review by Red Onion's Institutional Classification Authority ("ICA"). Under VDOC Operating Procedure ("OP") 830.1, the ICA is responsible for conducting classification hearings and reviews. ICA hearings may be held informally, like for an annual review, or may require a formal due process hearing, which occurs for reasons like removal from general population or changing a classification level outside of an annual review. OP 830.1 requires that an inmate receive notice within forty-eight hours of a formal due process hearing and be allowed to attend the formal hearing, to remain silent, to have a counselor or other employee present to advise him, to receive a copy of the decision, and to appeal the decision. When conducting an inmate's classification review, the ICA forwards only a recommendation for security classification. Except for assignments to Level S, a warden or designee reviews each ICA recommendation and has the discretion to approve or disapprove the ICA's recommendation for security level changes. The VDOC's Central Classification Services ("CSS") approves or disapproves assignments to Level S and may override mandatory restrictors or inmate assignment criteria.[1] Once assigned to segregation, the ICA reviews the inmate's status at least once every ninety days. In determining whether to extend segregation status for another ninety day period, the ICA should consider, <u>inter alia</u>, the reason for the assignment, the inmate's behavior, the inmate's progress made toward case plan objectives, and whether the inmate poses a threat to institutional safety and security.

---

[1] An inmate may appeal an ICA classification decision via administrative grievances, and a warden may appeal a CCS classification decision to the Director of Offender Management Services.

2

Level S is not a scored security level but is a special purpose bed assignment, and Red Onion is the only VDOC facility that houses Level S and Level 6 inmates. Red Onion's Level S inmates are given the opportunity to participate in the "Challenge Series," a goal-oriented, incentive-based segregation housing plan requiring inmates to complete the study of pro-social goals and seven workbooks. When inmates exhibit positive behaviors and succeed in completing the established goals of the program, they are rewarded with more privileges via a reduction in their security classification.

Red Onion's Level S inmates are assessed and assigned to the following security classifications, listed from most to least restrictive: Intensive Management ("IM") IM-0, IM-1, IM-2, and IM-SL6; and Special Management ("SM") SM-0, SM-1, and SM-2.[2] SM Inmates may progress to Level 6 General Population Structured Living-Phase 1 and Phase 2, and graduation from this final stage makes the inmate eligible to be assigned to Level 5 and be housed in a traditional general population setting. However, IM inmates are not eligible for the

---

[2] IM inmates are those inmates:
> with the potential for extreme and/or deadly violence[.] [T]hey may have an institutional adjustment history indicating the capability for extreme/deadly violence against staff or other offenders. This group most often would have an extensive criminal history and lifestyle that has escalated so that extreme/deadly violence has become a behavioral characteristic. The potential for extreme or deadly violence is not eliminated despite the offender's daily institutional adjustment even when providing more than a year or compliant, polite, and cooperative behavior and attitude. Alternatively, the offender may present a routinely disruptive and threatening patter of behavior and attitude. Also includes offenders incarcerated for a notorious crime that puts them at risk from other offenders.

SM inmates are those inmates:
> who may display an institutional adjustment history indicating repeated disruptive behavior at lower level facilities, a history of fighting with staff or offenders, and/or violent disruptive behavior at lower level facilities, a history of fighting with staff or offenders, and/or violent resistance towards a staff intervention resulting in harm to staff, other offenders without the intent to invoke serious harm or the intent to kill, or serious damage to the facility, and where reasonable interventions at the lower security level have not been successful in eliminating disruptive behaviors.

Inmates in IM-0 or SM-0 exhibit inappropriate behavior or choose not to participate in the step-down program. Consequently, they do not benefit from the step-down programming and instead receive the basic requirements afforded to inmates in VDOC special housing units.

3

step-down to Level 6 structured living. Instead, IM inmates graduate to the IM-SL6 Closed Pod, which gives IM inmates possibly facing long term housing at high security the opportunity for a better quality of life. IM or SM inmates who do not satisfy program criteria at any time can be returned to a higher classification either by a decision of the Unit Management Team, or, for serious infractions or repeated intransigence, immediately by the Building Supervisor and then reviewed by the Unit Management Team. In contrast, inmates who complete established goals of the program may have their security classifications reduced to Level 6, at which point the inmate is placed into a group setting and receives many of the same privileges as inmates in the general population. If the inmate completes the Level 6 program, the inmate may be stepped down to Level 5 and placed in the general population.

While confined in Red Onion, staff conducted numerous ICA hearings to review Plaintiff's housing status and security level. Specifically, the relevant ICA hearings occurred in 2013 on August 19 and 26, September 24, and November 4; in 2014 on January 31, April 8, July 3 and 30, September 4 and 25, and October 14 and 15. Plaintiff contends that the hearings were "arbitrary," "erroneous," "meaningless[,] and a sham" because they continued his believed-to-be unnecessary segregation even after the KMCC investigation had completed without resulting in any charge against him. Plaintiff also alleges that he repeatedly was denied the forty-eight hours' advance notice before ICA hearings and the opportunity to be heard during the hearings.

A non-defendant conducted Plaintiff's initial ICA hearing on August 19, 2013. Plaintiff was present at the hearing and stated he did not know why he was at Red Onion and that he was not charged with a disciplinary infraction at KMCC. The next day, the ICA recommended that

4

Plaintiff remain in administrative segregation pending records review and appropriate housing assignment. Defendant Younce approved the recommendation on August 22, 2013.

Younce conducted the ICA hearing on August 26, 2013, allegedly outside of Plaintiff's presence. Two days later, Younce recommended that Plaintiff be assigned to Level S based on the recent transfer for possible institutional infractions at KMCC. Defendants Red Onion Assistant Warden Walrath and Regional Operations Chief G.K. Washington approved this recommendation on August 30 and September 26, 2013, respectively.

Plaintiff alleges that on September 18, 2013, Younce informed Plaintiff of the classification decision. Plaintiff asked Younce why he was assigned to Level S even though the KMCC investigation had cleared Plaintiff of wrongdoing. Younce allegedly said that the Warden did not explain the rationale to him:

> Honestly, man, I don't know. I'm just following orders. The Warden told me to classify you as a Level "S" offender and to send you to C-Building to do the Challenge Series behavior program . . . . There's no rationale. I don't know why the Warden . . . is making me do this to you when the investigation cleared and you didn't receive any charges. If I was you, I'[d] write it up and go all the way.

Plaintiff faults Younce for not conducting a proper ICA hearing with advance notice and Plaintiff's presence and faults defendant Mullins who, as Plaintiff's counselor, was responsible for protecting Plaintiff's due process rights. Plaintiff also faults Warden Mathena both for ordering Younce to increase Plaintiff's classification despite the conclusion of the KMCC investigation and for not correcting the errors after reviewing Plaintiff's regular grievance about the classification decision. Plaintiff also faults Walrath, Washington, and Regional Administrator Hinkle for approving either Younce's classification recommendation or Mathena's rejection of Plaintiff's grievance.

Defendant Swiney, the Unit Manager of Red Onion's C-Building, reviewed Plaintiff's security level on November 4, 2013, and recommended that Plaintiff be housed in Level S at SM-1 "based on needing a longer period of stable adjustment." Swiney approved his own recommendation the same day. Plaintiff complains that the hearing violated due process because he did not receive forty-eight hours' advance notice or the opportunity to be present. Plaintiff further complains that he should have had his ICA classification hearings every thirty days, not once every ninety days.

Defendant Lt. Day conducted the next ICA hearing at Plaintiff's cell door on January 31, 2014, with Plaintiff's counselor, defendant Kegley, present. Lt. Day recommended that Plaintiff remain housed in Level S at "SM-1" "based on needing a longer period of stable adjustment." Lt. Day allegedly announced her decision and walked away before Plaintiff had the opportunity to say anything. Defendant Kilbourne approved the recommendation on February 28, 2014. Plaintiff faults Lt. Day, Kegley, and Kilbourne for permitting the "sham" hearing to result in his continued confinement at Level S and not having a "meaningful" review every thirty days.

Lt. Day also reviewed Plaintiff's security level on April 8, 2014, recommending that Plaintiff be reduced to Level S at SM-2 based on needing a "longer period of stable adjustment and to meet the requirements of the step down program." Defendant Turner, a Unit Manager, approved the recommendation on April 22, 2014. Again, Plaintiff faults Lt. Day and Turner for permitting the "sham" hearing to result in his continued confinement at Level S and not having a "meaningful" review every thirty days.

Defendant Turner reviewed Plaintiff's security level on July 3, 2014. Four days later, Turner recommended that Plaintiff be increased to Level S at IM-1 even though Plaintiff had had

6

already been reduced to Level S SM-2, had completed the Challenge Series for IM-0, and had remained charge free. Turner approved his own recommendation the same day. Plaintiff believes Turner increased his classification because defendants Artrip and Mathena spread unfounded rumors that Plaintiff conspired to kidnap, escape, and murder the KMCC Warden, even though Plaintiff allegedly had, months earlier, shown Turner the investigative report from KMCC exonerating him of any wrongdoing. Plaintiff concludes that the hearing was a "sham" because it was based on "false facts and st[a]le[] information," lasted seconds, and did not allow him the opportunity to be heard.

Turner also reviewed Plaintiff's security level on September 4, 2014. On September 29, 2014, Turner recommended that Plaintiff remain in Level S at IM-1, and he approved his own recommendation on the same day.

In late September 2014, Red Onion staff received notice from staff at a special investigations unit that Plaintiff had not been charged as a result of KMCC's investigation. Consequently, a non-defendant conducted an interim ICA hearing on September 25, 2014, and recommended that Plaintiff's security level be reduced from Level S to Level 6.[3] Warden Mathena approved the recommendation that same day, noting, "The information related to [Plaintiff's] assignment to [Level] 'S' has been cleared up. There[]fore, since he has completed the Challenge [S]eries, I will process him to SL 6. [Plaintiff] and I agreed, SL 6 was the correct progression for him during a meeting on September 24th."

Nearly three weeks later on October 14, 2014, Lt. Day reviewed Plaintiff's security level and recommended that Plaintiff be assigned to Structured Living Phase 1 "based on completion of Challenge Series, 90 days charge free[,] and approved by DTT." Turner approved the

---

[3] This recommendation was adopted on October 15, 2014.

decision the same day. On October 15, 2014, a non-defendant recommended Plaintiff's security classification be reduced from Level S to Level 6, which Warden Mathena approved on the next day.[4]

## II.

Defendants argue that they are entitled to qualified immunity and summary judgment. A party is entitled to summary judgment if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); see Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (recognizing a party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant). "Material facts" are those facts necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts that demonstrate the existence of a genuine dispute of fact for trial. Id. at 322-24. A court may not resolve disputed facts, weigh the evidence, or make determinations of credibility. Russell v. Microdyne

---

[4] As a Level 6 Phase 1 inmate, Plaintiff was housed in a single cell, was unrestrained for showers and recreation, had group outside recreation for one hour twice per week, had group inside recreation for one hour when there was no outside recreation, and could walk to the dining hall with other inmates for meals. On January 7, 2015, Plaintiff was assigned to Structured Living Phase 2. On April 22, 2015, the ICA recommended that Plaintiff be reassigned to Level 5, thereby assigning him to Red Onion's general population. Defendant Mathena approved that recommendation on April 30, 2015. As of March 2016, Plaintiff has been housed at River North Correctional Center.

8

Corp., 65 F.3d 1229, 1239 (4th Cir. 1995); Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Instead, a court accepts as true the evidence of the non-moving party and resolves all internal conflicts and inferences in the non-moving party's favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).

Qualified immunity permits "government officials performing discretionary functions . . . [to be] shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Once a defendant raises the qualified immunity defense, a plaintiff bears the burden to show that a defendant's conduct violated the plaintiff's right. Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993).

### III.

Plaintiff argues that the conditions he experienced while segregated at Level S constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. Plaintiff further argues that his segregation at Level S violated due process protected by the Fourteenth Amendment.

### A.

"[T]he Due Process Clause [of the Fourteenth Amendment] affords [an inmate] no greater protection than does the Cruel and Unusual Punishments Clause" when that inmate challenges the substantive conditions of his confinement. Whitley v. Albers, 475 U.S. 312, 327 (1986); see Williams v. Benjamin, 77 F.3d 756, 768 (4th Cir. 1996). "Allegations that prison conditions 'involve the wanton and unnecessary infliction of pain,' or 'are grossly disproportionate to the severity of the crime,' or are 'without any penological purpose' fall

9

squarely within the ambit of the Eighth Amendment—not the due process clause." Prieto v. Clarke, 780 F.3d 245, 251 (4th Cir. 2015) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). The Eighth Amendment "requires a court to examine whether prison conditions impose cruel and unusual punishment," whereas "[t]he Due Process clause requires a court to determine whether a state has provided prisoners with adequate process in applying prison regulations and policies." Id. Accordingly, Plaintiff's substantive due process claim about the condition of confinement must be subsumed into his Eighth Amendment claim.

Plaintiff alleges the following conditions of segregation constitute cruel and unusual punishment because they are more restrictive than conditions experienced by inmates in general population at Red Onion: he could not buy as much from the commissary; he was deprived of personal property like a television, personal music player, sneakers, and surge protectors; he earned a lower rate of good conduct time; his cell door was constructed with more metal; it was not as easy to communicate with other inmates; he had out-of-cell recreation up to five hours a week; his outside recreation was limited to a fenced in area with barbed wire; he could shower three times a week; he ate his meals alone in his cell; he had to wear security restraints and be escorted while moving inside the prison; he experienced more cell and strip searches; his communications are constantly "under surveillance"; he could not have contact visitation; and he could not participate in group educational or religious classes. Plaintiff further complains that the segregated inmates in high-security often hear loud noises and smell feces and pepper spray because they "constantly throw feces at the guard and smear it all over the wall and their cells . . . .[,] kick and bang on the door all day and night[,] and flood their cells when they don't get what they want . . . ."

10

The Eighth Amendment expressly prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. "It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." Williams, 77 F.3d at 761. Accordingly, the Eighth Amendment "imposes duties on [prison] officials who must provide humane conditions of confinement." Farmer v. Brennan, 511 U.S. 825, 832 (1994). Specifically, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." Id. (internal quotations omitted). While the Constitution protects inmates from cruel and unusual living conditions, an inmate is not entitled to relief because he has been exposed to uncomfortable, restrictive, or inconvenient conditions of confinement. See Henderson v. Virginia, No. 7:06-cv-00408, 2007 U.S. Dist. LEXIS 70207, at *26, 2007 WL 2781722, at *7 (W.D. Va. Sept. 21, 2007) (Conrad, J.). Rather, "[t]o the extent that such conditions are restrictive or even harsh, they are part of the penalty that criminal inmates pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347 (1981).

To survive summary judgment with respect to "an Eighth Amendment 'cruel and unusual' punishment claim, an inmate must prove two elements: (1) that objectively the deprivation suffered or harm inflicted was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998); see De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013). For the subjective component, the inmate must show that the defendant "actually kn[e]w of and disregard[ed] an objectively serious condition, medical need, or risk of harm." Farmer, 511 U.S. at 837.

11

For the objective component, a plaintiff must establish "a 'serious or significant physical or emotional injury resulting from the challenged conditions' or a substantial risk thereof.'" De'lonta, 708 F.3d at 525 (quoting De'lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003)). Therefore, a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions. If an inmate has not suffered serious or significant physical or mental injury as a result of the challenged conditions, he simply has not been subjected to cruel and unusual punishment prohibited by the Eighth Amendment. Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir. 1993); see De'Lonta, 330 F.3d at 634 ("To demonstrate such an extreme deprivation, a prisoner must allege a serious or significant physical or emotional injury resulting from the challenged conditions or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions." (internal quotation marks and citation omitted)).

Plaintiff has not established that he suffered a "serious or significant physical or emotional injury" as a result of being housed at Red Onion between August 2013 and October 2014. Instead, he complains about theoretical harms a person could suffer, the length of time he was in segregation, and the privilege restrictions he encountered. However, the law does not establish that confinement in administrative segregation in and of itself amounts to cruel and unusual punishment, even if for a prolonged period. See In re Long Term Admin. Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 469 (4th Cir. 1999); Sweet v. S.C. Dep't of Corr., 529 F.2d 854, 861-62 (4th Cir. 1975). "[I]solation from companionship, restriction on intellectual stimulation[,] and prolonged inactivity" are "inescapable accompaniments of segregated confinement," and those specific conditions "will not render segregated confinement

12

unconstitutional absent other illegitimate deprivations," such as adequate food, clothing, shelter, and medical care. In re Five Percenters, 174 F.3d at 472 (quoting Sweet, 529 F.2d at 861). Furthermore, the complained of conditions are not deprivations of basic human needs but are the uncomfortable, restrictive, or inconvenient conditions of confinement that are part of Plaintiff's criminal penalty. See, e.g., Rhodes, 452 U.S. at 347. Accordingly, Defendants are entitled to qualified immunity and summary judgment for the Eighth Amendment claims about the conditions of confinement.

## B.

Plaintiff argues that his approximately one-year assignment to Level S violated due process guaranteed by the Fourteenth Amendment. Defendants attached various OPs in support of their motion for summary judgment that do not cover the time at issue: August 2013 to October 2014. Specifically, Defendants filed OPs 830.1, effective June 1, 2014; 830.2, effective January 1, 2015; and 861.3, effective April 1, 2015. Plaintiff filed OPs 830.1, effective June 1, 2011; 830.2, effective January 1, 2012; and 861.3, effective October 1, 2011. Plaintiff also filed 830.A, effective February 18, 2013, but did not include its attachments. However, Plaintiff's copies include various annotations, and none of Plaintiff's copies are accompanied by a business custodian's affidavit. The court further notes that additional OPs and attachments referenced in the procedures may be useful for adjudicating the due process claim. Accordingly, Defendants' motion for summary judgment is denied without prejudice as to the due process claim.

Pursuant to Standing Order 2013-6, Defendants shall file a new motion for summary judgment on the remaining Fourteenth Amendment claims supported by, inter alia, the following OPs or revisions that were in effect between August 2013 and October 2014: 420.2 (about the

13

use of restraints); 425.4 (about cell assignments); 802.1 (about inmate property); 830.1 (about facility classification management); 830.2 (about security level classification); 830.A (about the Step-Down Program); and 861.3 (about special housing). All attachments to a policy, as noted in each, must accompany the policy.[5] Defendants should support their arguments with evidence, especially as to the legal tests identified in Sandin v. Conner, 515 U.S. 472, 474 (1995), Mathews v. Eldridge, 424 U.S. 319, 323 (1976), Prieto v. Clarke, 780 F.3d 245, 247 (4th Cir. 2015), and Incumaa v. Stirling, 791 F.3d 517, 519 (4th Cir. 2015), and they must note when the relevant KMCC investigation involving Plaintiff concluded. Plaintiff will have twenty-one days to respond, and Defendants shall reply within fourteen days thereafter.

IV.

For the foregoing reasons, the court grants Defendants' motion for summary judgment in part as to the Eighth Amendment claims and denies it without prejudice as to the Fourteenth Amendment claims about Plaintiff's classification at Level S. Defendants shall file a new motion for summary judgment within forty-five days, Plaintiff then will have twenty-one days to respond, and Defendants shall reply within fourteen days thereafter.

ENTER: This 7th day of July, 2016.

/s/ Michael F. Urbanski
United States District Judge

---

[5] If OPs 420.2 and 425.4 are not authorized for inmate possession and public disclosure, they may be filed under seal for in camera review.