CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 2 2 2017

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| HASSIN HUBBERT, | ) | Civil Action No. 7:14-cv-00530 |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| G. K. WASHINGTON, et al., | ) | By:  Hon. Michael F. Urbanski |
|     Defendants. | ) |        United States District Judge |

Hassin Hubbert, a Virginia inmate proceeding pro se, filed a civil rights complaint pursuant to 42 U.S.C. § 1983, naming current and former staff of the Virginia Department of Corrections ("VDOC") and Red Onion State Prison ("Red Onion") as defendants. Plaintiff complains that his classification and incarceration at Security Level S in Red Onion between August 2013 and October 2014 violated the Eighth and Fourteenth Amendments of the United States Constitution. Previously, the court had granted Defendants' first motion for summary judgment in part as to the Eighth Amendment claim, denied it as to the Fourteenth Amendment procedural due process claim, and required additional briefing and exhibits. Defendants have filed a second motion for summary judgment with the requested exhibits, to which Plaintiff responded, making this matter ripe for disposition. After reviewing the expanded record, including the sealed records, the court grants Defendants' second motion for summary judgment.

I.

The procedural history of Plaintiff's confinement at Keen Mountain Correctional Center ("KMCC") and Red Onion are detailed in the court's prior memorandum opinion, and it is unnecessary to repeat that information here. Instead, the court describes the relevant incidents of

prison life expected for an inmate classified at Level S in Red Onion and for which Plaintiff commenced this action.[1]

Red Onion's Level S inmates may be designated in one of two main categories: Intensive Management ("IM") or Special Management ("SM").[2] From the most to least restrictive security classifications, IM inmates are designated as IM-0, IM-1, IM-2, and IM-SL6, and SM inmates are designated as SM-0, SM-1, and SM-2.[3] SM-2 inmates may be reduced to Level 6's Structured Living Phase 1 and then to Phase 2. Graduation from Phase 2 makes the inmate eligible to be assigned to Level 5 and housed in a general population unit. Plaintiff was designated as IM for approximately three months and as SM for approximately eleven months.

When inmates exhibit positive behaviors and successfully complete established goals, they are rewarded with more privileges via a reduction in their security classifications. All Level S inmates are given the opportunity to participate in the "Challenge Series," a goal-oriented,

---

[1] Level S is not a scored security level but is a special purpose bed assignment. Red Onion is the only VDOC facility that houses Level S inmates.

[2] IM inmates are those inmates:
> [W]ith the potential for extreme and/or deadly violence[.] [T]hey may have an institutional adjustment history indicating the capability for extreme/deadly violence against staff or other offenders. This group most often would have an extensive criminal history and lifestyle that has escalated so that extreme/deadly violence has become a behavioral characteristic. The potential for extreme or deadly violence is not eliminated despite the offender's daily institutional adjustment even when providing more than a year or compliant, polite, and cooperative behavior and attitude. Alternatively, the offender may present a routinely disruptive and threatening patter of behavior and attitude. Also includes offenders incarcerated for a notorious crime that puts them at risk from other offenders.

SM inmates are those inmates:
> [W]ho may display an institutional adjustment history indicating repeated disruptive behavior at lower level facilities, a history of fighting with staff or offenders, and/or violent disruptive behavior at lower level facilities, a history of fighting with staff or offenders, and/or violent resistance towards a staff intervention resulting in harm to staff, other offenders without the intent to invoke serious harm or the intent to kill, or serious damage to the facility, and where reasonable interventions at the lower security level have not been successful in eliminating disruptive behaviors.

[3] Inmates in IM-0 or SM-0 choose not to participate in the step-down program or continue to exhibit inappropriate behavior. Consequently, they do not benefit from the step-down programming and instead receive the basic requirements afforded to inmates in VDOC special housing units.

2

incentive-based segregation housing plan for inmates to study pro-social goals via seven workbooks. A multi-disciplinary group of staff who work in the housing unit called the Unit Management Team tracks and rates each Level S inmate's weekly performance for things like personal hygiene, respect, and standing for count as achievable progress toward the next lower security level. Counselors also rate each inmate's participation as incomplete, positive effort, or complete. Staff in both groups should communicate the ratings to inmates, acknowledge positive performance, and motivate inmates for improvement.[4] An IM or SM inmate who does not satisfy program criteria at any time can be denied a "step down" to a lower classification or returned to a higher classification level.

During the time relevant to this case, male Level S inmates were permitted numerous personal property: shoes; clothing; bedding; towels; a toothbrush; a calendar; a pen; an address book; approximately forty first-class stamps; reading material; reading glasses; a radio; an audio player[5]; batteries; comb; hairbrush; shaving razor; watch; wedding band; eyeglasses; prescribed medical items; and religious items.[6] Level S inmates are restrained in handcuffs and shackles, are strip searched, and are escorted by several officers whenever they leave their cells.

IM and SM inmates are afforded similar privileges. All IM inmates had the following minimum privileges: two library books per week; religious and legal materials in the cell; commissary; educational and religious television programs displayed on a pod wall; a radio; an

---

[4] In addition to the Unit Management Team's weekly progress ratings, the Institutional Classification Authority ("ICA") routinely reviews all segregation inmates approximately every ninety days. The ICA reviews and acts on recommendations for step increases or reductions, and all classification decisions may be appealed through the Offender Grievance Procedure.

[5] The VDOC calls it a "JP4," and it would more commonly be known as an mp3 player.

[6] Access to some personal property is prohibited when an inmate moves from Level 5 to Level S. For example, the Level S inmate may no longer possess a photo album, a belt, a toothbrush case, handkerchiefs, tennis shoes, a calculator, sunglasses, board games, playing cards, and a coffee mug. These items would be stored until the inmate was sent to a lower level facility.

3

audio player; individual in-cell correctional programs; two hours of outside[7] recreation per week; two twenty-minute phone calls per month; three showers per week; and a non-contact visit for one hour per week.[8] Inmates in IM levels less restrictive than IM-0 receive greater content or frequency of the privileges like more library books per week and more access and variety of in-cell television programs. IM-2 and IM-SL6 inmates may have jobs, and notably, IM-2 and SM-2 inmates may receive correctional programming in groups of up to five inmates. Per policy, IM and SM inmates receive the same types of meals as served to the general population, but IM and SM inmates eat their meals alone in their cells.

An inmate's classification is reduced from Level S to Level 6 Structured Living when staff determines an SM-2 inmate has satisfactorily completed the Challenge Series curriculum and achieved the behavioral goals of SM-2. The purpose of Level 6 Structured Living is to reintroduce inmates into a social environment and to test their readiness for possible transfer to the general population at Level 5. Phase 1 inmates are single celled, are allowed to exit a cell and enter the pod individually, are unrestrained during showers and recreation, have individual and group therapy, enjoy outside recreation two hours per week, may listen to audio books, and walk as a group to the dining hall to eat group meals. Phase 2 inmates have the same privileges as Phase 1 but are housed with a cellmate.

Plaintiff complains that Level S inmates "constantly throw feces at the guard and smear it all over the wall and their cells . . . .[,] kick and bang on the door all day and night[,] and flood their cells when they don't get what they want . . . ." Plaintiff also complains that the following

---

[7] If weather does not allow for outside recreation, recreation occurs in the pod.
[8] SM inmates and inmates at Level 6 Structured Living Phases 1 and 2 are generally afforded the same "minimum" privileges as IM inmates, but SM inmates are granted more privileges quicker as they "step down" security levels. For example, SM inmates have earlier access to jobs and are permitted more visitation and more phone calls.

4

conditions of his segregation were more restrictive than conditions experienced by inmates in general population during his approximate 420 day[9] stay at Level S: he could not buy as much from the commissary; he was deprived of personal property like a television, a JP-4 personal audio player, headphones, sneakers, long johns, and surge protectors; he earned a lower rate of good conduct time; his cell door was constructed with more metal; it was not as easy to communicate with other inmates; he no longer had out-of-cell recreation up to five hours a week; his outside recreation was limited to a fenced in area with barbed wire; he could shower only three times a week; he ate his meals alone in his cell; he was escorted and wore security restraints while moving inside the prison; his cell was searched more often; he was strip searched more often; his communications were "under surveillance" constantly; visitation was non-contact; and he could not participate in group educational or religious classes.[10]

## II.

Defendants argue that they are entitled to qualified immunity and summary judgment. Qualified immunity permits "government officials performing discretionary functions . . . [to be] shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[11]

---

[9] Plaintiff alleges he spent 425 days in segregation, and defendants aver it was 415 days. The difference is likely dependent on the days spent in investigatory detention before Plaintiff was transferred to Red Onion. Nevertheless, the ten day difference is not material.

[10] Although Plaintiff complains generally about being stripped searched more often and not having group religious services as a consequence of his classification, he does not challenge these conditions independently. See, e.g., O'Lone v. Estate of Shabazz, 482 U.S. 342, 348-49 (1987); Bell v. Wolfish, 441 U.S. 520, 559 (1979); see also Sweet v. S.C. Dep't of Corr., 529 F.2d 854, 860-62 (4th Cir. 1975) (en banc) (discussing reasonable and legitimate penological interests to preclude group religious services for inmates in segregation). The court notes that record does not reflect a policy that requires strip searches more often of Level S inmates or that Level S inmates are treated differently in this regard than inmates in lower security classifications.

[11] Rights may be "clearly established" sufficient to overcome a defendant's claim of qualified immunity if a "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful[.]" United States v. Lanier, 520 U.S. 259, 271 (1997) (internal quotation marks omitted). "Decisional law" for this case refers

5

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); In re Allen, 106 F.3d 582, 593 (4th Cir. 1997) ("[A]n official may claim qualified immunity as long as his actions are not clearly established to be beyond the boundaries of his discretionary authority."). Once a defendant raises the qualified immunity defense, a plaintiff bears the burden to show that a defendant's conduct violated the plaintiff's right. Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993).

A party is entitled to summary judgment if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); see Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (recognizing a party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant). "Material facts" are those facts necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts that demonstrate the existence of a genuine dispute of fact for trial. Id. at 322-24. A court may not resolve disputed facts, weigh the evidence, or make determinations of credibility. Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995); Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Instead, a court accepts as true the evidence of the non-moving party and resolves all

---

to decisions of the United States Supreme Court, Fourth Circuit Court of Appeals, and Virginia Supreme Court issued before the relevant time. Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999). Decisions from United States District Courts are not pertinent the "clearly established" analysis. Id.

internal conflicts and inferences in the non-moving party's favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). A plaintiff cannot use a response to a motion for summary judgment to amend or correct a complaint challenged by the motion for summary judgment. Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009).

### III.

The remaining claim before the court concerns whether Plaintiff's confinement in Red Onion at Level S violated procedural due process guaranteed by the Fourteenth Amendment. The court finds that it did not and awards the Defendants qualified immunity and summary judgment.

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. "To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law."[12] Prieto v. Clarke, 780 F.3d 245, 248 (4th Cir. 2015). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies."[13] Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (citations omitted).

---

[12] Notably, a claim that prison officials have not followed their own independent policies or procedures does not state a constitutional claim. See United States v. Caceres, 440 U.S. 741, 752-55 (1979); Riccio v. Cnty. of Fairfax, 907 F.2d 1459, 1468-69 (4th Cir. 1990) (holding that if state law grants more procedural rights than the Constitution requires, a state's failure to abide by that law is not a federal due process issue).

[13] The amended complaint addresses only a "state created constitutional protected liberty interest," not under the Due Process Clause by its own force, and the court declines to construct such a claim for Plaintiff. See Beverati v. Smith, 120 F.3d 500, 502 (4th Cir. 1997) ("Since there is no contention here, nor logically could there be, that the confinement to administrative segregation exceeds the sentence imposed in such an extreme way as to give rise to the protection of the Due Process Clause by its own force, the question before us is whether Inmates' confinement in administrative segregation imposed such an atypical hardship on them vis a vis ordinary prison life that they possessed a liberty interest in avoiding it."); see also Brock v. Carroll, 107 F.3d 241, 243 (4th Cir. 1997)

"The United States Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." Id. at 221-22; see Allgood v. Morris, 724 F.2d 1098, 1101 (4th Cir. 1984) ("[S]egregated confinement is not per se unconstitutional." (citing Sweet, 529 F.2d at 860-62). However, a state-created liberty interest may exist if the inmate points to "a basis for an interest or expectation in state regulations" to avoid the conditions of his confinement under the segregation classification scheme at Red Onion and also shows that those conditions impose atypical and significant hardship in relation to the ordinary incidents of prison life.[14] Sandin v. Conner, 515 U.S. 472, 484 (1995); Prieto, 780 F.3d at 250. Only if the inmate satisfies both conditions does the Due Process Clause require a particular measure of procedural protection before a deprivation of a liberty interest. Id.

Nonetheless, the legitimacy of the VDOC's purpose in designing the Level S program is "beyond question . . . . [when] the regulations are expressly aimed at protecting prison security, a purpose . . . central to all other corrections goals." Thornburgh v. Abbott, 490 U.S. 401, 415 (1989) (internal quotation marks omitted). "The State's first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves." Wilkinson, 545 U.S. at 227. "The difficulties of operating a detention center must not be underestimated by the courts[,]" and "correctional officials . . . must have substantial discretion to devise reasonable solutions to the problems they face" in maintaining prison security and safety. Florence v. Bd. of Chosen Freeholders, 566 U.S. 318, 326 (2012); see Wolff v. McDonnell, 418 U.S. 539, 556

---

(Luttig, J., concurring); Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985); Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978) (recognizing that a district court is not expected to assume the role of advocate for a pro se plaintiff).

[14] The normative baseline for a prisoner are the "conditions dictated by a prisoner's conviction and sentence . . . constituting the 'ordinary incidents of prison life.'" Incumaa v. Stirling, 791 F.3d 517, 527 (4th Cir. 2015). General population is the baseline in this case. See id.; cf. Prieto, 780 F.3d at 253 (concerning prisoners sentenced to death).

8

(1974) ("[T]he fact that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed."); see also Graham v. Connor, 490 U.S. 386, 455 (1989) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." (internal quotation marks and citation omitted)).

Assuming, arguendo, that VDOC policy creates a liberty interest to avoid the conditions of Level S at Red Onion, the court finds that Plaintiff's approximate one-year confinement there, and the attendant conditions he experienced, did not constitute an "atypical and significant hardship" compared to the "ordinary incidents of prison life" he could expect. See Sandin, 515 U.S. at 484. The mere limitations on privileges, property, and activities for administratively segregated inmates "fall[] within the expected perimeters of the sentence imposed by a court of law." Sandin, 515 U.S. at 485; see Gaston v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991) (holding that changes in a prisoner's "location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges — matters which every prisoner can anticipate are contemplated by his original sentence to prison — are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage the prisons safely and efficiently").

The duration and conditions of Plaintiff's confinement at Red Onion do not implicate the concerns discussed in Wilkinson v. Austin, 545 U.S. 209, 213 (2005), and Incumaa v. Stirling, 791 F.3d 517, 519 (4th Cir. 2015). In Wilkinson, the Supreme Court found that inmates had a protected liberty interest in avoiding assignment to a state "supermax" prison. Without undergoing a point-by-point comparison of the conditions between segregation and general

9

population, the Supreme Court distinguished the supermax conditions from normal segregation for three primary reasons. First, inmates in the supermax prison were "deprived of almost any environmental or sensory stimuli and of almost all human contact."[15] Wilkinson, 545 U.S. at 214. Second, the inmates were assigned to the supermax prison for "an indefinite period of time, limited only by [the] inmate's sentence." Id. Third, inmates otherwise eligible for parole lost that eligibility while imprisoned at the supermax prison. Id. at 215. "[A]ny of these conditions standing alone might not be sufficient to create a liberty interest, [but] taken together[,] they impose[d] an atypical and significant hardship within the correctional context." Id. at 224. Similarly in Incumaa, the Fourth Circuit found a protected liberty interest in avoiding assignment to South Carolina's supermax based on the prisoner's twenty-year confinement there and its isolating and restrictive living conditions, including a highly intrusive strip search every time he left his cell for twenty years. 791 F.3d at 531-32.

Taken together, the concerns espoused in Wilkinson and Incumaa focus on the indefinite nature of supermax confinement. In Wilkinson, prison policies provided "no indication how long [an inmate] may be incarcerated [at the supermax] once assigned there." 545 U.S. at 215. Also, policy required infrequent review of the continued appropriateness of an inmate's specific segregation status: once initially, thirty days after his arrival, and annually thereafter. Id. at 217. The policy in Incumaa required an institutional classification committee to evaluate the inmate's status every thirty days. 791 F.3d at 522-23. South Carolina policy provided that the inmate could qualify for reclassification and release from the supermax by achieving an "improvement

---

[15] The conditions at the supermax prison included, "[a]lmost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; [and] exercise is for 1 hour per day, but only in a small indoor room." Id. at 223-24. The Supreme Court noted that the lack of human contact was the most distinctive of these living conditions. Id. at 224.

10

in behavior level." Id. South Carolina policy further defined "behavior level" as including a clear disciplinary record and the staff's evaluation of the inmate's overall compliance. Id. at 522. However, the inmate in Incumaa had never incurred a disciplinary infraction in twenty years, yet staff kept the inmate in supermax conditions for twenty years without any behavioral basis for doing so. Id. at 521-23.

Undoubtedly, Level S inmates experience more restrictive conditions than Level 5 inmates in general population, but that fact does not render such confinement atypical or significantly harsh. General population inmates can also expect cell and strip searches, temporary housing in segregation under similar restrictions, and limited access to property and the public. See Sandin, 515 U.S. at 486 (discussing similar conditions for thirty days); Beverati, 120 F.3d at 504 (same for six months).

Policy provided Plaintiff with personal property that not only constituted life's basic necessities, but also allowed books, an audio player, religious items, and multiple means to communicate with the public. Level S inmates are allowed jobs, visitation, group experiences, television programming, educational programming, and various commissary purchases.

Unlike Wilkinson, the record does not reflect that Level S inmates are deprived of environmental or sensory stimuli and all human contact.[16] Plaintiff alleges it is not as easy to communicate with other inmates while in Level S, but Plaintiff fails to establish that "conversation is not permitted from cell to cell."[17] See Wilkinson, 545 U.S. 209 (noting conversation was not permitted from cell to cell as a factor for the Court's conclusion all human

---

[16] Indeed, Plaintiff complains of too much stimuli caused by other inmates.
[17] A Red Onion inmate designated as IM-0 filed an affidavit in support of the complaint. Notably, the inmate explains, "I was standing at my cell door when this conversation [between Plaintiff and staff] took place, even though the wall[s] are made of paper as you can hear everything anyway." Cf. Wilkinson, 545 U.S. at 214 (noting the cells were constructed in such a way to prevent conversation or communication between inmates).

11

contact was prohibited). Furthermore, positive communication with staff is encouraged as inmates work through the step down program to lower their security level. Also unlike Wilkinson where the supermax inmates were kept inside and reviewed once a year, Level S inmates are afforded environmental stimuli three times a week with outdoor recreation, are "informally" reviewed every thirty days, and are "formally" reviewed every ninety days.[18] Unlike Incumaa, Level S inmates are not solely dependent on the subjective perspectives of staff during a review. Instead, Level S inmates can objectively demonstrate pro-social progress by completing the Challenge Series workbooks.[19] Also unlike the twenty-year restrictions experienced in Incumaa, Plaintiff spent a drastically shorter period of time at Level S – approximately fourteen months, of which approximately three he spent as an IM inmate.

Plaintiff's various complaints about fewer amenities in Level 6 do not describe an atypical or significant hardship. Many of Plaintiff's complaints are frivolous, like not having sneakers instead of state issue shoes; not being allowed unlimited commissary purchases; having a cell door constructed with more metal; exercising in a fenced in area with barbed wire, which sounds no different than a prison generally; having his communications "under surveillance"; and not participating in educational programs. See, e.g., Wolff, 418 U.S. at 576-77; Thornburgh, 490 U.S. at 413; Women Prisoners of D.C. Dep't of Corr. v. D.C., 93 F.3d 910, 927, 320 U.S. App. D.C. 247 (D.C. Cir. 1996). Furthermore, prisoners have no constitutional right to contact visitation or an expectation of privacy in a prison cell. See, e.g., Block v. Rutherford, 468 U.S. 576, 589 (1984); Hudson v. Palmer, 468 U.S. 517, 525 (1984). Also, the fact Level S inmates are "incentivized" to complete seven workbooks and examine their behaviors is neither an

---

[18] "Informal" and "formal" refers generally to the extent an inmate has notice of the hearing and is involved in the review process.
[19] Nonetheless, completion of the Challenge Series is but one factor considered.

12

atypical nor significant hardship. See, e.g., McKune v. Lile, 536 U.S. 24, 36, 40 (2002) (noting "[t]he Court has instructed that rehabilitation is a legitimate penological interest that must be weighed against the exercise of an inmate's liberty" and concluding "the denial of discrete prison privileges for refusal to participate in a rehabilitation program [does not] amount[] to unconstitutional compulsion"); see also id. at 54 (Stevens, J., dissenting) ("No one could possibly disagree with the plurality's statement that offering inmates minimal incentives to participate [in a rehabilitation program] does not amount to compelled self-incrimination prohibited by the Fifth Amendment." (internal quotation marks omitted)).

Plaintiff does not establish that confinement at Red Onion made him ineligible for parole, which was the case for the inmate in at the supermax facility in Wilkinson.[20] Moreover, Plaintiff does not allege that earned good conduct time was taken away as a consequence of being designated as Level S.[21]

In sum, the record does not establish that the conditions of Plaintiff's confinement at Level S in Red Onion imposed an atypical and significant hardship in relation to the ordinary

---

[20] Plaintiff does not establish that was ever eligible for parole for the crimes he committed. Attachments to the complaint show Plaintiff was classified as "ineligible" for parole, and court records from the Circuit Court of Roanoke City show that Plaintiff was incarcerated after pleading guilty in July 2009 to, inter alia, a murder committed in 2008. See In Re Katrina Canal Breaches Consol. Litig., 533 F. Supp. 2d 615, 631-33 & nn.14-15 (E.D. La. 2008) (collecting cases indicating that federal courts may take judicial notice of governmental websites, including court records). Parole was discontinued in Virginia long before Plaintiff committed his crimes in 2008. See VA. CODE § 53.1-165.1 (abolishing parole for individuals convicted of a felony committed after January 1, 1995).

[21] Despite Plaintiff's repeated assertion of being "punished by loss of good conduct time," the record does not reflect that the assignment to Level S determined the length of his sentence. Instead, the record reflects that he did not earn good conduct time as a result of being Level S. Inmates do not have a protected liberty interest in earning a specific rate of good conduct time, and courts have held that the effect of a classification change on the ability to earn good-time credit is too speculative to constitute a deprivation of a protected liberty interest. See, e.g., Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 7 (1979); Luken v. Scott, 71 F.3d 192, 193-94 (5th Cir. 1995) (citing Meachum v. Fano, 427 U.S. 215, 229 n.8 (1976)); DeBlasio v. Johnson, 128 F. Supp. 2d 315, 329-30 (E.D. Va. 2000), aff'd, 13 F. App'x 96 (4th Cir. 2001); see also Wolff, 418 U.S. at 557-58 (recognizing the Constitution does not guarantee good time credit for satisfactory behavior while in prison). Consequently, the court cannot find that Plaintiff's time at Red Onion inevitably affected the length of his confinement so as to trigger a separate, constitutionally protected liberty interest in avoiding that classification. See, e.g., Sandin, 515 U.S. at 487.

incidents of prison life. The conditions at Level S are distinguishable from the isolating conditions and indefiniteness identified in <u>Wilkinson</u> and <u>Incumaa</u>, and Plaintiff fails to describe the violation of a federal right that was clearly-established before or during his confinement at Level S in Red Onion. <u>See</u> <u>Edwards</u>, 178 F.3d at 251 (referring to clearly established law as from the United States Supreme Court, Fourth Circuit Court of Appeals, and Virginia Supreme Court). Accordingly, Defendants are entitled to qualified immunity and summary judgment.

## IV.

For the foregoing reasons, the court grants Defendants' second motion for summary judgment.

ENTER: This 22nd day of March, 2017.

/s/ Michael F. Urbanski
United States District Judge